This time we'll hear Harris v. the SEC. We'll wait until the hubbub subsides. You do seem to be losing your audience. They're going to miss the best part. They probably just want lunch. I think we can get rolling. Good morning. Good morning. Good morning, Your Honors, and may it please the Court, my name is Paula Schaffner, and I represent the petitioner in this matter, Tom M. Harris. And thank you for taking argument on this. This is an important issue for Mr. Harris. He's been permanently barred by the securities industry and found liable for securities fraud. He was a registered representative. FINRA, which is the governing agency for the brokerage industry here in the United States of America, has 3,700 firms within it that are registered with FINRA. They also have 631,000 brokers, excuse me, that are registered with FINRA. The SEC decision would establish, if left intact, establishes a dangerous precedent that would require every one of those brokers who does not have a fiduciary obligation to make disclosure of non-transaction-based compensation when they're making a recommendation to buy or sell the security. So in the ordinary course of business, these registered representatives have numerous interactions with various issuers, particularly with public companies. They may have been involved with the issuer to develop a private placement. They may go to lunch or to dinner with them. Are you saying that FINRA can only sanction, impose sanctions on people who violate fiduciary duties? No, I'm not. I'm not. So the fact that your client didn't violate a fiduciary duty doesn't really get you home. No, but it does speak to whether or not there's a violation of 10b-5. So if there's a 10b-5 securities fraud basically says, have you made a misrepresentation, have you made a false statement in connection with the purchase or sale of a security? Or an omission. Right. That's one side. And everybody agrees that in this case, Mr. Harris did not make any misrepresentations. This is an omission case. Yeah. This is an omission case. So this, both the United States Supreme Court and this circuit has held that in an omission case, there needs to be, there's no liability for failure to speak unless you have a duty to disclose. And that's where we come back to the fiduciary duty. Mr. Harris was not a registered investment advisor, which would have had a fiduciary duty. These were not discretionary accounts where there would have been a fiduciary duty. The question is whether these can be regarded, I think, as a form of excessive commission. However you call it, but this massive payment, I think the position of the SEC and FINRA before it constituted a form of excessive commission that was not disclosed. I would disagree with Your Honor for this reason. What the FINRA and NAC said was that it was a, quote, single, substantial, non-transaction-based payment for consulting services. And then these two partners used that to open a brokerage firm. But that's critical in this case, that it was non-transaction-based payment. So at no point was there a finding of fact that this was an excessive commission. All of the cases that the SEC has referred to all have some transaction-based component to it when there's a finding of liability in an omission case for a 10b-5 violation. Those transaction-based items are excessive commissions. They could be the fact that the firm is selling out of its own inventory, that otherwise it's a market maker. But every single one of those cases involved that kind of scenario. And because we have a specific finding here, that these are not the same. Just as a theory, the possibility that some excessive self-interest in the security at issue, in the transaction, is enough to trigger a duty to disclose to customers that you're selling that security. And if I'm right about that, then you agree that you'll lose, at least based on Skelly and Zur and so on? That excessive self-interest was financial, correct? And it was based in that particular transaction, unlike this particular case, where the monies that were paid were not paid for Mr. Harris and his partner to sell Deere securities. The brokerage firm that they opened, there was a finding of a company says to a BD, a corrupt broker-dealer, I'm going to pay you $5 million if you sell, in connection with pump-and-dump scheme, all of these securities at a particular price. But it's not particular transactions. I'm just going to give you $5 million to sell off these securities. And the broker-dealer, through its brokers, fails to disclose that to its clients in selling those securities. Is that not a violation of a duty? I would say, Your Honor, that that is a violation, because you have that connection there between the payment and the explicit idea that you are to sell these securities. And so why was it not clear under these facts a basis at least for FINRA to determine that this consulting fee, this $350,000 payment, was effectively the same thing, as an insider at a company saying, I'm going to give you $350,000 to unload these securities onto unsuspecting customers? But there was no such finding here. And that finding was not supported by the evidence. There were only four people who testified at the FINRA hearing. It was Mr. Harris and his partner, a FINRA examiner, and the operations manager. And based on all of those facts, what the findings were, both at the FINRA and at the National Adjudicatory Council, was that it was not transaction-based. In Your Honor's example, that is a specific payment in order to sell specific securities. So there is a connection there that does not exist here. You know, there's a lot of debate now with the Department of Labor fiduciary rule that has been proposed and put on hold as to whether or not registered representatives should have this fiduciary duty that would make it a more expansive relationship. But the fact of the matter is, at the time that this happened, that type of relationship did not exist. And absent that duty, absent a fiduciary relationship and a duty to speak, Mr. Harris had no such duty. I would also point out that, yes, there was a significant payment, but this leads to a very broad spectrum of, if you're going to impose an obligation on registered reps that have no other fiduciary duty to start disclosing all of their touches with various companies, it's quite a slippery slope. And there's a very broad range. What was that $350,000 payment for? For purposes of this appeal, we have not challenged the finding that it was for consulting services. It was for consulting services because they went to China to spend two hours. Mr. Harris did not go to China. Somebody else. The partner and the office manager did. That was the consulting. Yes. And there were other touches with this. Two hours of looking at household equipment. Consumer and kitchen household products was the business of Deere Company, yes. That's nice work if you can get it because that's like $175,000 an hour. Even the Wall Street lawyers are not charging that. Well, I would query whether or not, say for example, you undertake some other Why isn't there an available inference that the consulting fee was so large and was used to acquire the broker-dealer agency that there was an obligation to disclose this extraordinary relationship when you're pushing the stock of the people who lent  it to you? I'm not saying that there's not any such remedy. There is, and in fact, the case that the SEC conceded. What remedy is there? There would be, I would say that there would be a violation of a FINRA rule. The case that the SEC refers to where there, the Kuntz, K-U-N-Z case, where there was a development of a broker-dealer. So there would be a violation of a FINRA rule? Yes. Because your client signed on to FINRA. I'm sorry? Your client signed on to FINRA and agreed not to violate the rules, and the fact that those rules are not violated and are observed and respected by the people who are members of that organization is the reason that the NASDAQ can function. Isn't that right? Yes, but Your Honor, the rule is just an equitable principle of trade rule under FINRA. This, what we're dealing with here, is an expansion of the K-U-N-Z. And if there's a violation, if there's a violation of the rule, and if on top of it, they conclude, as they found, that your client lied in testimony, isn't that a pretty good reason for FINRA deciding that we don't want this person, a person of this character in our industry? I think that you need to, you need to slice away. It's nothing personal. I mean, it's just, it's just a, you know. I understand that. And as in the Kuntz case, which did not involve 10b-5, so the continued referral to that case, you know, here's somebody who was paid to open up a brokerage firm, that was a violation of a FINRA rule. He was required, he had a three-month suspension. It was not, he was not found guilty of fraud in that. It was a violation of the FINRA rule for just and equitable principles of trade. He was given a suspension, and he was required to requalify. Your view is that the violation of 10b-5 ultimately led to this permanent bar. I would say that if you overturn the 10b-5 violation, there would have to be a renewed decision by FINRA panel. Re-evaluation of the penalty. What do we do now? Right. What do we do now? And that's what your, that's really the thrust of your argument. And your argument is that we should view a 10b-5 violation in this context as requiring a transaction-based undisclosed commission. So a commission for a particular transaction to a particular client. Correct. And the — And we've never said anything one way or the other about that. That's correct. And the SEC's response to that is, well, maybe there's not a fiduciary duty here. But the rep was making a recommendation, so he had to disclose this conflict of interest. If we go to that wholesale definition, then every registered rep will, by virtue of that definition, be a fiduciary. And that's just not the obligations of a rep. Well, no. Because there are commissions, and there are payments, and then there are excessive payments. And I take it that the SEC said, well, this $350,000 payment for two hours is excessive. So if it had been a cup of coffee from the company in China, that would be one thing. But this is a different thing altogether. Correct. But the key fact here is the finding, the very specific finding, that it was not transaction-based. And in the absence of that connection, we can't conclude that it was a commission. Nobody concluded that this was an excessive commission, or we would be having a different debate. Thank you. You've reserved a minute's rebuttal, so we will hear you then. May it please the Court. Benjamin Avedo for the Securities and Exchange Commission. I think it's important to remember that the essential facts of this case are not in dispute. In December 2009, Harris and his business partner took $350,000 from Deere, a Chinese issuer, purportedly for these consulting services. Over the next two months, they used that money to pay the expenses connected to opening up their new brokerage. Then once they opened their new brokerage, they started recommending Deere securities to their customers, without disclosing that just weeks ago they'd gotten $350,000 from Deere. Now, since 1970, at least, when this Court decided the Chaston case, it's been very clear that brokers who choose to make recommendations to their clients must disclose information material to those recommendations. Mr. Harris is not challenging the commission's materiality finding here. He doesn't contest that this $350,000 payment was immaterial. The very specific argument that she's making. That it's not transaction-based. Well, she's correct. The commission concluded that this wasn't a transaction-based compensation in the way one normally thinks about transaction-based compensation or the way the commission talks about it. It wasn't a percentage of money paid on a particular securities transaction. It was instead $350,000 from an issuer to the brokers that were making the recommendations. Now, the fact that it wasn't tied or it wasn't payable until a recommendation was made, we don't think affects its materiality. And nothing in the case law says that only transaction-based compensation is subject to disclosure. Breyer. What she's leveraging is that nothing in the case law says anything to the contrary either. I mean, is that right? Well, that's at the point. I guess, Your Honor, I can't think of any cases off the top of my head. And in my research, I didn't come across any where, you know, a payment upfront before anything was done was at issue. But I just struggle with the idea that simply because an issuer decided to pay the money upfront and trust that the recommendations that were anticipated would be made, would in fact be made, would somehow shield a broker from their responsibility of disclosing this piece of material information. In many of these pump-and-dump schemes, there is an upfront payment of one type or the other. It's not uncommon. I think another thing to remember in this case, Your Honor, is this really isn't what we would think of as a commission. In these cases where they talk about excessive commissions, nearly always what you're talking about is a sum of money that's being paid by the broker-dealer to its sales agents internally. So Skelly makes this point, actually. And what Judge Rakoff is pointing out in Skelly is that in the normal course of business, a customer expects that his broker is going to get some compensation for the transactions. So you don't really have to disclose specially the normally expected compensation. However, if it's excessive, if it's unusual, if it's very large, then a broker would have some obligation to disclose it to their customer when they're making recommendations. This, however, is something different. This is money received from the issuer, not money paid by the broker-dealer employer to its sales agents. So I think that slightly makes this a case somewhat different. We do think the issuer compensation is not usually a form of a bribe. It could certainly be viewed that way. Now, the commission noted in its order that given the undisputed facts here, that there were approximately two hours of consulting services, and that was it, and there was $350,000, it had the appearance of a quid pro quo. We think that's absolutely correct. We think that's the most rational inference from the undisputed facts, that this was, in fact, a form of a quid pro quo. Now, you don't have to actually – I mean, the quid pro quo don't have to match up. You don't have to wait for the quid before you get the pro. I mean, it just doesn't – it doesn't work that way necessarily. Yes, sir? And on the point of the bars, I know that Mr. Harris is unhappy with the bar, and that's not surprising, but it also needs to be remembered that, again, he's not contesting the factual findings. He's not contesting that FINRA correctly concluded that he misled FINRA. This is a very serious issue. FINRA is a self-regulatory organization. Its entire regulatory structure is premised on the voluntary and truthful cooperation of its members. And he doesn't dispute that in several instances he did mislead them. He misled them with respect to the $350,000. He attempted to support Mr. Scholender, his business partner's story, that this wasn't really their money, this was the office manager's money. FINRA found that to be completely lacking credibility and false. He doesn't dispute FINRA's conclusion that his representation that he was a mere employee of the new brokerage and not a part owner was just flatly false. These are important facts that he attempted to mislead FINRA about. And under FINRA's own guidelines when it comes to sanctions, whether you've cooperated or misled FINRA is a very important consideration. And the Securities and Exchange Commission itself has concluded that misleading FINRA or lying to FINRA makes you presumptively unfit to be a broker. If the Court has no further questions, we'd ask that you affirm the order and rest on our briefs. Roberts. Are we not denying a petition rather than affirming an order? That is correct, Your Honor. You are denying a petition. I apologize. Just very briefly in rebuttal, there have been a lot of aspersions cast about and suggestions of bribery, pump and dump and items like that. I'd like to point out that the SEC went outside the record and in footnote four of their decision made reference to the fact that, you know, they had brought a separate action against the Chinese promoter of the companies and that the U.S. attorney for the Southern District of New York had brought criminal charges as well. I think they were entitled to do that because it was a matter of public record. But I think it's all part of the aspersion that somehow there was bribery and a pump and dump scheme here. I'd like to note for the Court that both those SEC charges against the Chinese promoter and the criminal charges have all been dismissed within the last few weeks. They have all been dismissed. So we need to really limit ourselves to the facts here, which are nobody decided that this was a commission. And the factual finding was contrary to that, that it was non-transaction based. And in that instance, there was no duty to disclose. And the 10b-5 charge has to be thrown out. And then FINRA can re-decide what punishment is fit for Mr. Harris. Thank you. Thank you. Thank you both. We'll reserve decision.